T.C. Memo. 2014-30

UNITED STATES TAX COURT

ROUTE 231, LLC, JOHN D. CARR, TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13216-10.                    Filed February 24, 2014.

William Lee S. Rowe, Timothy L. Jacobs, and Hilary B. Lefko, for

petitioner.

Timothy B. Heavner, John M. Tkacik, Jr., Warren P. Simonsen, and Mary

Ann Waters, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, Judge:  On March 17, 2010, respondent issued two notices of

final partnership administrative adjustment (FPAAs) to John D. Carr (petitioner),

[*2] as tax matters partner of Route 231, LLC (Route 231), one regarding Route 231's tax year 2005 and the other regarding its tax year 2006. The FPAA for tax year 2005 proposed an adjustment to ordinary income of $3,816,000, among other things.[1] The FPAA for tax year 2006 did not involve an adjustment to ordinary income. Petitioner filed a timely petition for readjustment under section 6226 regarding the FPAA for tax year 2005. No petition was filed regarding the FPAA for tax year 2006.

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

After concessions we must decide (1) whether Route 231 engaged in a disguised sale under section 707 and, if so, (2) whether the proceeds from the disguised sale were income to Route 231 for tax year 2005.

FINDINGS OF FACT

Some facts have been stipulated and are so found. At the time petitioner filed the petition, Route 231's principal place of business was in Virginia. Route

---

[1]The FPAA for tax year 2005 also proposed an adjustment to Route 231's net farm profit (loss) and an adjustment to noncash charitable contributions. These adjustments are not in issue.

[*3] 231 treated itself as a partnership for Federal income tax purposes at all relevant times.

Virginia Tax Credits

During 2005 and 2006 Virginia provided an income tax credit to encourage the preservation and sustainability of its unique natural resources, wildlife habitats, open spaces, and forested areas. For 2005 this Virginia tax credit was equal to 50% of the "fair market value" of any land or interest in land in Virginia donated to a public or private conservation agency eligible to hold such land and interests therein for conservation or preservation purposes. The credit was available to individuals and corporations for use on their Virginia income tax returns. A partner in a passthrough entity that held Virginia tax credits could use the credits on his or her own Virginia income tax returns either in proportion to his or her interest in the entity or as set forth in the partnership agreement. Any taxpayer holding Virginia tax credits could transfer or sell unused but otherwise allowable credits to another taxpayer for use on his or her Virginia income tax return. A Virginia tax credit, however, could be claimed by only one taxpayer on his or her Virginia income tax return.

The Virginia Department of Taxation (VDT) verified a taxpayer's right to claim Virginia tax credits on his or her Virginia income tax return by requiring

**[*4]** that the credits be registered, among other things. In order to register the Virginia tax credits, the donor of a conservation easement was required to submit a completed Form LPC, Virginia Land Preservation Tax Credit Notification, and supporting documentation to the VDT. Supporting documentation included (1) a full copy of the qualified appraisal for the donated property, (2) a copy of the recorded deed for charitable donation, and (3) an Internal Revenue Service (IRS) Form 8283, Noncash Charitable Contributions, executed by the donee of the donated property.

While not prescribed by Virginia statute or regulation, the VDT required procedurally that the Virginia taxpayer submit a Form LPC before he or she could use any allocated or transferred tax credits on a Virginia income tax return. Likewise, while not prescribed by Virginia statute or regulation, the VDT directed donors and credit holders to submit the Form LPC and supporting documentation within 90 days of the origination or transfer of the Virginia tax credits or at least 60 days before filing the annual Virginia income tax return claiming the credits.

Section IV, Transfer Information, of the Form LPC contained spaces for information relating to the transfer and the resulting transferee of all or any portion of the Virginia tax credits, including the name of the transferee and the date of the transfer. Section V, Declaration, Signature and Notarization, contained a space for

**[*5]** the signature of the credit holder and was to be signed and notarized under the penalties provided by law. Section VI, Credit Allocation Schedule, contained spaces for information about each person receiving a credit from a passthrough entity and for the amounts of the credits.

Once the VDT received the Form LPC and supporting documentation, it would review the submitted documents for compliance with applicable rules and procedures. If this preliminary review suggested compliance, the VDT would provide a tax credit acknowledgment letter. The credit acknowledgment letter included a "credit transaction number", the "effective year" for the tax credits--i.e., the first year for which they could be claimed--and the "expires tax year" for the tax credits--i.e., the last year for which they could be claimed. The credit acknowledgment letter stated: "A copy of this letter must be attached to your [Virginia income tax] return to claim the credit. You will need the assigned credit number if you wish to transfer this credit in the future." If a taxpayer wished to use his or her Virginia tax credits on a Virginia income tax return, the VDT required that the taxpayer provide a copy of the credit acknowledgment letter.

During the 2006 legislative session Virginia made several changes to the statutory provisions applicable to the Virginia tax credit. These changes applied only to conveyances of property made on or after January 1, 2007. On November

**[*6]** 30, 2007, the Virginia tax commissioner released a summary of the changes in the form of a ruling. The ruling explained that the VDT would "no longer simply acknowledg[e] the Credit as has been done in the past" but would have to "actually <u>issue</u> the Credit" for the Virginia tax credit to be valid.

Route 231

In 2001 Raymond Humiston, a securities trader from Connecticut, moved his family to a farming community in Albemarle, Virginia. In the farming community there were two tracts of property named Castle Hill and Walnut Mountain. Castle Hill consists of 1,203 acres, including a historic manor home dating to 1764. Walnut Mountain consists of 345 acres.

Mr. Humiston met petitioner, a businessman, in 2005. Petitioner owns two farms and an apartment rental business, and he sits on the boards of several materials companies. Petitioner and Mr. Humiston decided to acquire Castle Hill and Walnut Mountain together.

In May 2005 Mr. Humiston and petitioner formed Route 231, a Virginia limited liability company. Petitioner and Mr. Humiston signed an initial operating agreement for Route 231, effective May 3, 2005, in which they agreed to each

[*7] make an original capital contribution of $2 million.[2]  The initial operating agreement stated that petitioner and Mr. Humiston each owned a "percentage interest" equal to 50% in Route 231.  The initial operating agreement further stated that the purpose of Route 231 was to "own, acquire, manage and operate" certain real property not described in the initial operating agreement.

In or around June 2005 Route 231 engaged Conservation Solutions to provide consulting services regarding Route 231's potential acquisition of Castle Hill and Walnut Mountain, the initial management of those properties, the division of those properties, and the placing of conservation easements on those properties. At all relevant times Melton McGuire was the principal and owner of Conservation Solutions.  At a meeting on June 3, 2005, Mr. McGuire gave a presentation to Route 231 about placing a conservation easement on Castle Hill; the presentation discussed the tax benefits that could be derived from the easement.

On June 28, 2005, Route 231 purchased Castle Hill and Walnut Mountain for $24 million.  Route 231 financed the purchase with a loan from BB&T Bank that was guaranteed personally by petitioner and Mr. Humiston.  Walnut Mountain

---

[2]Despite this agreement, the record reflects that petitioner and Mr. Humiston actually made contributions of $2,300,000 each.

[*8] was subdivided into 24 lots before Route 231 purchased it. On November 30, 2005, Route 231 sold 4 of the 24 lots to an individual for $2,200,000.

Donation of Conservation Easements

On December 9, 2005, Route 231 obtained an appraisal report valuing a conservation easement on Castle Hill (Castle Hill easement) at $8,849,240; a conservation easement on Walnut Mountain (Walnut Mountain easement) at $5,225,249; and a fee interest in Walnut Mountain subject to the Walnut Mountain easement (Walnut Mountain fee interest) at $2,072,880. Route 231 obtained the appraisal report in anticipation of making charitable contributions. The effective date of the appraisal report was December 2, 2005.

Effective December 30, 2005, Route 231 made three separate charitable contributions of property: (1) a deed of gift of the Castle Hill easement to the Nature Conservancy; (2) a deed of gift of the Walnut Mountain easement to the Albemarle County Public Recreational Facilities Authority; and (3) a deed of gift of the Walnut Mountain fee interest to the Nature Conservancy.

Virginia Conservation

Virginia Conservation is a Virginia limited liability limited partnership that was interested in acquiring Virginia tax credits. Virginia Conservation acquired Virginia tax credits via partnership arrangements with landowners who placed

[*9] conservation easements on property in Virginia. When dealing with other partnership arrangements with landowners, Virginia Conservation generally contributed $0.53 for each dollar of Virginia tax credits that the landowner partnerships would allocate to it. Once Virginia Conservation received these Virginia tax credits, it would allocate them to individual investors or to Chesterfield Conservancy, Inc. (Chesterfield Conservancy), a nonstock corporation that owned an interest in Virginia Conservation. Chesterfield Conservancy would then sell the credits to other individuals or entities interested in claiming Virginia tax credits on their Virginia income tax returns.

In or around June 2005 Virginia Conservation began discussions with Route 231 regarding Virginia tax credits relating to the placement of conservation easements on Castle Hill and Walnut Mountain.

In July 2005 Route 231, through Mr. McGuire, and Virginia Conservation discussed Virginia Conservation's possible investment in Route 231 and Route 231's allocation of Virginia tax credits from the Castle Hill easement and the Walnut Mountain easement to Virginia Conservation. Sometime later in 2005 Virginia Conservation agreed to make a capital contribution to Route 231 based on the Virginia tax credits Route 231 agreed to allocate to Virginia Conservation.

[*10] The negotiations between Route 231 and Virginia Conservation during 2005 culminated in an amended and restated operating agreement admitting Virginia Conservation as a member, three escrow agreements, and an option to purchase agreement. These transaction documents were finalized and executed in December 2005.

On December 27, 2005, Virginia Conservation, Mr. Humiston, and petitioner prepared and executed an amended and restated operating agreement of Route 231 (first amended operating agreement) which admitted Virginia Conservation as a partner in Route 231. The first amended operating agreement included an attachment indicating that Virginia Conservation was deemed to have made a $500 capital contribution to Route 231 on December 27, 2005. The first amended operating agreement further stated:

> 2.2 Fund Additional Capital Contribution. The Fund [Virginia Conservation], in accordance with a separate agreement between the parties, shall make an additional capital contribution to the Company [Route 231] in an amount equal to the product of $0.53 for each $1.00 of Virginia Credits allocated to the Fund * * *.

The first amended operating agreement provided for the allocation of items of partnership profits and losses and for the distribution of net cashflow from operations to the members in proportion to their "percentage interests" in Route 231. According to the first amended partnership agreement, petitioner's

**[*11]** percentage interest was 49.5%, Mr. Humiston's percentage interest was 49.5%, and Virginia Conservation's percentage interest was 1%.

The first amended operating agreement also provided for the allocation of Virginia tax credits, stating:

> 3.6   Virginia Credits.  Notwithstanding any other provision of this Agreement, Virginia Credits arising from the donation of the Easement and/or Conservation Deed in an amount anticipated to be in the range of $6,700,000 to $7,700,000 shall be allocated as follows: $300,000 of Virginia Credits to Carr [petitioner] and (ii) the balance to the Fund.  Any additional Virginia Credits arising from the donation of the Easement and/or Conservation Deed shall be allocated among the Members [petitioner, Mr. Humiston, and Virginia Conservation] * * *.

The first amended operating agreement further stated:

> 10.1   Representations and Warranties.  The Company, Carr and Humiston represent and warrant to the Fund as follows:
>
> (a)  The Virginia Credits will have been duly earned by the Company as a result of the Company's donation of the Easement and/or Conservation Deed in accordance with Va. Code § 58.1-512 on or before December 31, 2005.
>
> *       *       *       *       *       *       *
>
> (d)  The Company will deliver to the Fund valid Virginia Department of Taxation ("VDT") credit registration number(s) for the Virginia Credits.
>
> *       *       *       *       *       *       *

[*12] 10.2 Indemnification. If a claim is asserted against the Company or the Fund by VDT [Virginia Department of Taxation] or IRS that would have the effect of disallowing any or all of the Virginia Credits allocated to the Fund, the Company, Carr and Humiston shall have the option to defend such claim. Any such defense shall be limited solely to the issues of the disallowance of the Virginia Credits allocated to the Fund. If the Company, Carr and Humiston elect to not defend the claim, or upon a final, non-appealable decision resulting in a disallowance of any or all of the Virginia Credits allocated to the Fund, the Company, Carr and Humiston shall, jointly and severally, be liable to pay to the Fund in cash an amount equal to $0.53 for each $1.00 in value of such Virginia Credits disallowed.

On December 27, 2005, Virginia Conservation, Mr. Humiston, and petitioner also entered into an option to purchase (option agreement). The option agreement allowed Mr. Humiston and petitioner the option to purchase all, but not less than all, of Virginia Conservation's membership interest in Route 231, on or at any time after January 1, 2010. This option was still exercisable at the time of trial.

On December 28, 2005, Route 231 and Virginia Conservation signed three escrow agreements relating to the Castle Hill easement, the Walnut Mountain easement, and the Walnut Mountain fee interest. The Castle Hill easement escrow agreement involved $2,154,015 of escrowed proceeds. The Walnut Mountain easement escrow agreement involved $1,157,420 of escrowed proceeds. The Walnut Mountain fee interest escrow agreement involved $504,565 of escrowed

**[*13]** proceeds. The escrow agreements provided that the escrowed proceeds would be held in a non-interest-bearing attorney trust account until the following conditions of the escrow agreements were satisfied:

> A. The Landowner [Route 231] or the Fund [Virginia Conservation] has provided to the [trust] Agent:
>
>> (i) the Credit Transaction Number with respect to the Credits issued by the Virginia Department of Taxation * * *; and
>>
>> (ii) a copy of * * * [the deed of gift] bearing recording information or a copy of the original recording receipt therefor with a copy of * * * [the deed of gift], which evidences that * * * [the deed of gift] has been duly record * * *; and
>>
>> (iii) an Owner's Title Insurance Policy issued by Chicago Title Insurance Company * * * issued to the Landowner; and
>
> B. Agent has (i) provided all items in paragraph (A) above to Wm. Tracey Shaw * * * ('Counsel to the Fund') and (ii) received written instructions from Counsel to the Fund confirming the requirements of paragraph (A) above have been satisfied and authorizing the release of the Escrowed Proceeds to Landowner * * *.

The escrow agreements further stated:

> Upon receipt of the Credit Transaction Number, the Evidence of Recordation of * * * [the deed of gift], the New Owner's Policy, and Disbursement Authorization from Counsel to the Fund, and only upon receipt of all of them, Agent shall release the Escrowed Proceeds to the Landowner. Until such time as disbursement is made pursuant to this Agreement, Agent shall take all reasonable measures to ensure the protection of the Escrowed Proceeds.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

[*14] Notwithstanding anything to the contrary herein, and in recognition of the fact that the Escrowed Funds may be delivered to Agent prior to the recordation of * * * [the deed gift] or the Fund's admission as a member of the limited liability company designated above as Landowner, Agent shall immediately return the Escrow Proceeds, without deduction, to Fund if either (i) * * * [the deed of gift] is not recorded in the said Clerk's Office on or before December 31, 2005 or (ii) admission as a 1% member of the Fund is not made available to the Fund on or before December 31, 2005.

On December 29, 2005, Virginia Conservation made two wire transfers, totaling $3,816,000, to James Skeen, an attorney acting as the escrow agent. Mr. Skeen prepared Federal income tax returns for Route 231 during the years at issue. Mr. Skeen and his law firm also represented Conservation Solutions in the transactions between Route 231 and Virginia Conservation. Mr. Skeen placed the transfers into an attorney trust account.

On December 31, 2005, petitioner received a letter from Mr. McGuire. In the letter Mr. McGuire noted that Virginia Conservation "did not see proof of their credits until 6:00 pm on December 30" and that the amount of credits Virginia Conservation received was not sufficient to satisfy the amount of credits it had expected to receive. According to Mr. McGuire, the final figures were $84,000 short. Mr. McGuire thanked petitioner for "permitting us to transfer some of your surplus credits" to Virginia Conservation and promised to replace the $84,000 in Virginia tax credits in 2006.

**[\*15]**   On January 1, 2006, Virginia Conservation, Mr. Humiston, and petitioner executed an amended and restated operating agreement of Route 231 (second amended operating agreement).  Section 2.2 of the second amended operating agreement stated that Virginia Conservation "in accordance with a separate agreement between the parties, has made an additional capital contribution to the Company [Route 231] in an amount equal to * * * $0.53 for each $1.00 of Virginia Credits allocated to" Virginia Conservation.  Section 3.5 of the second amended operating agreement stated:  "Notwithstanding any other provision of this Agreement, Virginia Credits arising from the donation of the Easement and/or Conservation Deed have been allocated as follows:  (i) $215,983.00 of Virginia Credits to Carr and (ii) $7,200,000.00 of Virginia Credits" to Virginia Conservation.  Section 10.1(a) of the second amended operating agreement stated: "The Virginia Credits have been duly earned by the Company as a result of the Company's donation of the Easement and/or Conservation Deed in accordance with Va. Code § 58.1-512 on or before December 31, 2005."

The Escrow Account

On January 4, 2006, Route 231, via its attorney, George McCallum, requested that Mr. Skeen deposit the $3,816,000 of escrowed funds in Mr. Skeen's attorney trust account to an interest-bearing account.  Route 231 expressed

[*16] concern that the VDT would take three or more weeks to provide credit acknowledgment letters and that significant interest would be lost.

On January 6, 2006, following Route 231's request, Mr. Skeen opened an interest-bearing money market account at BB&T Bank in Route 231's name (care of Mr. Skeen, as agent) and under Route 231's employer identification number. He transferred the $3,816,000 of escrowed funds in his attorney trust account to the interest-bearing account. Mr. Skeen was the only signatory on the interest-bearing account.

Virginia Conservation did not authorize this transfer and was not notified about it until after it had occurred. On January 10, 2006, Mr. Skeen asked whether Virginia Conservation would consent to depositing the escrowed funds into the interest-bearing account.

From January 10 through 19, 2006, Mr. Skeen, Route 231 via Mr. McCallum, and Virginia Conservation via its attorney Wm. Tracey Shaw exchanged emails addressing their concerns regarding the interest-bearing account; the risk of loss if the escrowed funds declined in value while in the account; and whether Route 231 or Virginia Conservation would be entitled to the interest on the escrowed funds. In particular, Mr. Skeen expressed concern that if Virginia Conservation owned the escrowed funds while interest was being earned,

[*17] then questions might arise relating to "whether we can show, on the partnership tax return [for Route 231] that * * * [Virginia Conservation] made its contribution of capital during 2005."

The parties concluded that if the conditions of the escrow were satisfied, then the interest earned on the escrowed funds would be released to Route 231; otherwise, the interest earned would be paid to Virginia Conservation. The parties also concluded that Route 231 would bear the risk of loss for the escrowed funds and that it would not require Virginia Conservation to make any additional capital contributions in the event that the escrowed funds in the interest-bearing account declined in value.

On January 18, 2006, Virginia Conservation gave Mr. Skeen its approval to invest the escrowed funds in the interest-bearing account. On January 19, 2006, Virginia Conservation confirmed that Route 231 would be entitled to keep the interest earned on the funds in the interest-bearing account in the event that the conditions of the escrow were satisfied.

LPC Forms for Route 231

On or before December 21, 2005, Mr. Skeen began working on the Forms LPC for the three Route 231 donations. On January 20, 2006, Mr. Skeen submitted three Forms LPC, one for each donation, to the VDT. Mr. Skeen

**[*18]** enclosed copies of the appraisals with the Forms LPC. The Forms LPC reported credit values of $4,064,180 for the Castle Hill easement; $2,399,794 for the Walnut Mountain easement; and $952,009 for the Walnut Mountain fee interest. On the Form LPC for the Castle Hill easement Mr. Skeen listed Virginia Conservation under "Credit Holder Information" with Virginia tax credits of $4,064,180. On the Form LPC for the Walnut Mountain easement Mr. Skeen listed Virginia Conservation and petitioner under "Credit Holder Information" with Virginia tax credits of $2,183,811 and $215,983, respectively. On the Form LPC for the Walnut Mountain fee interest Mr. Skeen listed Virginia Conservation under "Credit Holder Information" with Virginia tax credits of $952,009. The VDT received the Forms LPC on January 27, 2006.

Route 231 received Credit Acknowledgment Letters dated March 27, 2006, from the VDT with respect to its three donations. These letters listed a credit transaction number for the Virginia tax credits, an effective year of 2005, and an expiration tax year of 2010.

On March 30, 2006, after Virginia Conservation received copies of credit acknowledgment letters addressed to it regarding the Route 231 donations, Mr. Skeen released the escrowed funds and accrued interest from the interest-bearing account.

**[\*19]** <u>Route 231's Tax Returns</u>

Route 231 filed a timely Form 1065, U.S. Return of Partnership Income, for tax year 2005, reporting that it had made noncash charitable contributions of $14,831,967. Route 231 also reported that it used the accrual method of accounting. Under Schedule L, Balance Sheet per Books, Route 231 reported cash of $4,166,236. Under Schedule M-2, Analysis of Partners' Capital Accounts, Route 231 reported capital contributed in cash of $8,416,000. Route 231 reported an aggregate balance in the partners' capital accounts of -$8,165,136. On a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., Route 231 reported $2,300,000 of capital contributed during 2005 and a capital account of -$5,916,408 for petitioner; $2,300,000 of capital contributed during 2005 and a capital account of -$5,916,408 for Mr. Humiston; and $3,816,000 of capital contributed during 2005 and a capital account of $3,667,680 for Virginia Conservation.

On April 12, 2006, Route 231 filed a Virginia Form 502, Pass-Through Entity Return of Income, with the VDT for tax year 2005. On the Form 502 Route 231 reported $7,415,983 under "Land Preservation Tax Credit". On a Schedule VK-1, Owners Share of Income and Virginia Modifications and Credits, for Virginia Conservation filed with the Form 502, Route 231 reported $7,200,000

[*20] under "Land Preservation Tax Credit". On a Schedule VK-1 for petitioner, Route 231 reported $215,983 under "Land Preservation Tax Credit."

Route 231 also filed timely its Form 1065 for tax year 2006 and reported no charitable contributions. On a Schedule K-1 for Virginia Conservation filed with its Form 1065, Route 231 reported that Virginia Conservation's share of Route 231's profit, loss, and capital was 1% at the end of 2006. Route 231 reported that it used the accrual method of accounting.

Use of the Virginia Tax Credits

Route 231 allocated $215,983 in Virginia tax credits to petitioner, who claimed them up to the allowable $100,000 annual limitation on his 2005 Virginia income tax return. Route 231 allocated the remaining $7,200,000 in Virginia tax credits to Virginia Conservation. Virginia Conservation allocated its Virginia tax credits to Chesterfield Conservancy.

FPAA for 2005

On March 17, 2010, respondent issued the FPAA for Route 231's tax year 2005, determining that Route 231 had incurred, but failed to report, ordinary income of $3,816,000 from the "[s]ale of Virginia Conservation Easement Tax Credits". The FPAA stated that the $3,816,000 Route 231 received from Virginia Conservation for Virginia tax credits was income to Route 231 because (1) the

[*21] credits were income derived from business under section 61(a)(2); (2) they were property taxable under section 61(a)(3) as ordinary income and not capital assets under section 1221; or (3) alternatively, they were property under section 1221 but taxable only as short-term capital gain. In response, petitioner filed the petition.

Route 231 Today

Route 231 and petitioner operate a working farm on the Castle Hill property. Route 231 maintains a winery business, a commercial orchard, and an event space. Petitioner and Virginia Conservation are still partners in Route 231.

OPINION

I. Burden of Proof

Generally, the Commissioner's adjustments in an FPAA are presumed correct, and the taxpayer bears the burden of proving those adjustments are erroneous. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Republic Plaza Props. P'ship v. Commissioner, 107 T.C. 94, 104 (1996) ("Petitioner bears the burden of proving respondent's determinations in the FPAA are erroneous."); Clovis I v. Commissioner, 88 T.C. 980, 982 (1987) (holding that an FPAA is the functional equivalent of a notice of deficiency). The burden of proof may shift to the Commissioner when the Commissioner's position implicates

[*22] a "new matter" not in the FPAA. See Rule 142(a)(1); Graev v. Commissioner, 140 T.C. __ , __ (slip op. at 5 n.3) (June 24, 2013). Petitioner contends that respondent has raised a new matter not in the FPAAs.

In the FPAA for 2005 respondent determined that Route 231 sold the tax credits to Virginia Conservation and, therefore, the sale proceeds were includible as ordinary income under section 61(a)(2) as income derived from a business. In the alternative, respondent determined that the credits were property taxable under section 61(a)(3) as gains derived from dealings in property as ordinary income or as short-term capital gain under section 1222. In the amended answer, however, respondent stated: "[I]n support of respondent's determination that petitioner received taxable proceeds in 2005 from the sale of Virginia state land preservation credits, respondent alleges that the 'capital contributions' from Virginia Conservation constituted ordinary income from a disguised sale under the provisions of I.R.C. § 707." Respondent contends that no new matter was invoked because "the underlying theory of a sale of credits did not change as a result of respondent's contention that the 'sale' was a 'disguised sale' under I.R.C. § 707".

The burden of proof is relevant only when there is equal evidence on both sides: "In a case where the standard of proof is preponderance of the evidence and the preponderance of the evidence favors one party, we may decide the case on the

[*23] weight of the evidence and not on an allocation of the burden of proof."

Knudsen v. Commissioner, 131 T.C. 185, 189 (2008). We do not believe that the

burden of proof affects the resolution in this case, since the preponderance of the

evidence resolves this issue no matter which party has the burden. See Graev v.

Commissioner, 140 T.C. at __ (slip op. at 26 n.8); Dagres v. Commissioner, 136

T.C. 263, 279 (2011). Consequently, we need not determine whether respondent

has invoked a new matter not in the FPAAs.[3]

II.     Evidentiary Issues

Petitioner raises relevancy objections as to paragraphs 250, 251, 252, 254,

255, 256, 257, 276, and 27 of the stipulation of facts. These paragraphs refer to

subsequent allocations and transfers of the Virginia tax credits. Petitioner also

raised relevancy objections to Exhibits 100-R, 101-R, 102-R, 103-R, 104-R, 105-

R, 107-R, 108-R, 117-R, and 118-R. These exhibits refer to subsequent transfers

of the Virginia tax credits.

_____

[3]Because respondent did not make any argument at trial or on brief that the
money Route 231 received was income because the credits were income derived
from business under sec. 61(a)(2) and property taxable as ordinary income under
sec. 61(a)(3), or, alternatively, that the credits were property under sec. 1221 and
taxable as short-term capital gain, respondent is deemed to have abandoned those
positions. See Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003) ("If an
argument is not pursued on brief, we may conclude that it has been abandoned.").

**[\*24]**   Rule 401 of the Federal Rules of Evidence defines relevant evidence as evidence having "any tendency to make a fact more or less probable than it would be without the evidence; and * * * the fact is of consequence in determining the action."  The Court of Appeals for the Fourth Circuit has stated that "transferability, although not essential, is * * * a relevant factor" as to whether tax credits are property.  Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d 129, 141 (4th Cir. 2011) (citing Drye v. United States, 528 U.S. 49, 60 n.7 (1999)), rev'g and remanding T.C. Memo. 2009-295.  The transfer of Virginia tax credits to Virginia Conservation and the subsequent transfers to Chesterfield Conservancy and individual investors are related to whether the Virginia tax credits in issue constitute property.  Thus, the paragraphs in the stipulation of facts and the exhibits to which petitioner objects are all relevant.

Petitioner further raises hearsay objections to Exhibits 100-R, 101-R, and 117-R.  These exhibits are Forms LPC that Virginia Conservation signed under the penalties provided by law, notarized, and filed with the VDT.  These exhibits are admissible under the business records exception pursuant to rule 803(6) of the Federal Rules of Evidence.  At trial David Gecker, who owned an interest in Virginia Conservation, and Beth Llewellyn, the accountant Virginia Conservation hired to fill out the Forms LPC, testified credibly that (a) the Forms LPC were

[*25] "made at or near the time" the transaction, occurred by Ms. Llewellyn, who was familiar with Virginia Conservation; (b) the Forms LPC were kept in the course of Virginia Conservation's ordinary business; and (c) making Forms LPC was a regular practice of that activity.

III.   Disguised Sale

Respondent contends that Route 231 sold Virginia tax credits to Virginia Conservation in exchange for cash and therefore engaged in a disguised sale under section 707.  Petitioner contends that Virginia Conservation made a capital contribution of cash and then Route 231 allocated Virginia tax credits to it.  In particular petitioner claims that there was no transfer of property for purposes of section 707 because (1) the credits were never "property" and (2) the credits were allocated rather than transferred.

A.      Statutory Framework

Partnerships are considered passthrough entities.  They are not subject to the income tax at the entity level.  Sec. 701.  Rather, "[t]he partnership acts as a conduit, through which its various items of income and loss flow to the individual partners".  Laura E. Cunningham & Noël B. Cunningham, The Logic of Subchapter K:  A Conceptual Guide to the Taxation of Partnerships 1 (4th ed. 2011).  In determining his or her income tax, each partner must include separately

[*26] his or her distributive share of the partnership's taxable income or loss, among other things. Sec. 702(a)(8). As a general rule, a partner's distributive share of income, gain, loss, deduction, or credit is determined by the partnership agreement. Sec. 704(a).

The Code provides generally that partners may contribute capital to a partnership tax free and may receive a tax-free return of previously taxed profits through distributions except to the extent the distribution exceeds adjusted basis. See secs. 721, 731. These nonrecognition rules, however, do not apply to a transaction between a partnership and a partner not acting in his or her capacity as a partner. Sec. 1.721-1(a), Income Tax Regs.; see sec. 707(a)(1). One such transaction, commonly referred to as a disguised sale, is governed by section 707.

Section 707(a) provides, in pertinent part:

> SEC. 707(a). Partner Not Acting in Capacity as Partner.--
>
> (1) In general.--If a partner engages in a transaction with a partnership other than in his capacity as a member of such partnership, the transaction shall, except as otherwise provided in this section, be considered as occurring between the partnership and one who is not a partner.

Section 707(a)(2)(B) provides that a disguised sale occurs (1) when a partner directly or indirectly transfers money or property to a partnership, (2) when there is a related direct or indirect transfer of money or other property by the partnership

**[\*27]** to such partner, and (3) when viewed together, the transfers are properly characterized as a sale or exchange of property.  In all cases the substance of the transaction governs rather than its form.  Sec. 1.707-1(a), Income Tax Regs.

Section 707 applies even if it is determined after the application of the rules that the purported partner is not a partner.  Sec. 1.707-3(a)(3), Income Tax Regs.; see also sec. 1.707-6(a), Income Tax Regs.[4]  Therefore, the status of a continuing partner-partnership relationship does not govern our decision in this case.

Section 707 "prevents use of the partnership provisions to render nontaxable what would in substance have been a taxable exchange if it had not been 'run through' the partnership."  Otey v. Commissioner, 70 T.C. 312, 317 (1978), aff'd, 634 F.2d 1046 (6th Cir. 1980).  Congress enacted section 707(a)(2)(B) because it was "concerned that individuals have deferred or avoided tax on sales of property

---

[4]Sec. 1.707-3, Income Tax Regs., expressly applies to situations in which the partner transfers property to the partnership, and the partnership transfers money or other consideration to the partner--i.e., the opposite of what occurred in this case.  Sec. 1.707-6(a), Income Tax Regs., however, notes that rules similar to those in sec. 1.707-3, Income Tax Regs., apply to the situation at hand, in which the partner transfers money to the partnership and the partnership transfers property to the partner.  It is therefore appropriate to apply the rules provided in sec. 1.707-3, Income Tax Regs., to this case.  See also Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d 129, 139 (4th Cir. 2011) (applying the rules in sec. 1.707-3(b)(1), Income Tax Regs., to a situation described in sec. 1.707-6(a), Income Tax Regs., in which a partner transferred money to the partnership in exchange for Virginia rehabilitation historic tax credits), rev'g and remanding T.C. Memo. 2009-295.

[*28] by characterizing sales as contributions of property followed (or preceded) by a related tax-free partnership distribution", especially given that "court decisions have allowed tax-free treatment in cases which are economically indistinguishable from sales of property to a partnership."  H.R. Rept. No. 98-432 (Part 2), at 1218 (1984), 1984 U.S.C.C.A.N. 697, 884; see also S. Prt. No. 98-169 (Vol. I), at 225 (1984).  Congress "believe[d] that these transactions should be treated for tax purposes in a manner consistent with their underlying economic substance."  H.R. Rept. No. 98-432 (Part 2), supra at 1218, 1984 U.S.C.C.A.N. at 884; see also S. Prt. No. 98-169 (Vol. I), supra at 225.

Section 1.707-3(b)(1), Income Tax Regs., clarifies which partnership transfers should be characterized properly as a sale or exchange of property under section 707(a)(2)(B)(iii).  Pursuant to section 1.707-3(b)(1), Income Tax Regs., a disguised sale has occurred only if, on all the facts and circumstances, (1) the transfer of money or other consideration would not have been made but for the transfer of property and (2) in cases in which the transfers are not made simultaneously, the subsequent transfer is not dependent on the entrepreneurial risks.

Section 1.707-3(b)(2), Income Tax Regs., provides a nonexhaustive list of 10 facts and circumstances that "may tend to prove the existence of a sale" under

[*29] section 1.707-3(b)(1), Income Tax Regs. The following six facts and circumstances are relevant in this case:

    (i) That the timing and amount of a subsequent transfer are determinable with reasonable certainty at the time of an earlier transfer;

    (ii) That the transferor has a legally enforceable right to the subsequent transfer;

    (iii) That the partner's right to receive the transfer of money or other consideration is secured in any manner, taking into account the period during which it is secured;

*       *       *       *       *       *       *

    (v) That any person has loaned or has agreed to loan the partnership the money or other consideration required to enable the partnership to make the transfer, taking into account whether any such lending obligation is subject to contingencies related to the results of partnership operations;

*       *       *       *       *       *       *

    (ix) That the transfer of money or other consideration by the partnership to the partner is disproportionately large in relationship to the partner's general and continuing interest in partnership profits; and

    (x) That the partner has no obligation to return or repay the money or other consideration to the partnership * * *.[5]

---

[5]The additional factors in sec. 1.707-3(b)(2)(iv), (vi), (vii), and (viii), Income Tax Regs., include (iv) whether any person made or was legally obligated to make a contribution to the partnership so that it could complete the transfer; (vi)

(continued...)

**[*30]** Sec. 1.707-3(b)(2), Income Tax Regs. The weight we give to each factor depends on the particular case. Id.

Finally, section 1.707-3(c)(1), Income Tax Regs., provides that transfers made between a partnership and a partner within a two-year period are "presumed to be a sale of the property to the partnership unless the facts and circumstances clearly establish that the transfers do not constitute a sale." We consider the facts and circumstances in this case to determine whether the transfers are presumed to be a sale.

---

[5](...continued) whether the partnership incurred or was obligated to incur debt to acquire the money or the consideration to complete the transfer; (vii) the amount of liquid partnership assets that were expected to be available to make the transfer; and (viii) whether the transfers were structured "to effect an exchange of the burdens and benefits of ownership of property." These factors are not relevant in this case. See also Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 139 (noting that factors (iv), (vi), (vii), and (viii) were not relevant in that case). Factor (iv) is irrelevant because petitioner lent Route 231 the extra Virginia tax credits it needed to complete the transfer. Factor (vi) is irrelevant because Route 231 did not need to incur debt to obtain the Virginia tax credits necessary to make the transfer; rather, Route 231 needed only to submit the Forms LPC. Factor (vii) is irrelevant because Route 231 was not engaged in a business at the time of the transfers. Finally, factor (viii) is irrelevant because the transfer of the Virginia tax credits was a one-time transfer and did not implicate general partnership distributions, allocations, or control of partnership operations.

[*31] B.    Va. Historic Tax Credit Fund 2001 LP v. Commissioner

Respondent's claim that Route 231 and Virginia Conservation engaged in a disguised sale relies on the reasoning and holding of the Court of Appeals for the Fourth Circuit in Va. Historic Tax Credit Fund 2001 LP (Va. Historic).  We follow a decision of the Court of Appeals to which an appeal from our disposition of a case lies so long as that decision is squarely on point and reversal upon appeal is inevitable.  See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971); see also Lardas v. Commissioner, 99 T.C. 490, 494-495 (1992).  The case at hand is appealable to the Court of Appeals for the Fourth Circuit.  For the reasons discussed below, we find that Va. Historic is squarely on point.

The facts in Va. Historic are similar to those in this case.  Three individuals set up a web of partnerships (funds) in order to pass Virginia historic rehabilitation tax credits to investors.  One fund was the "source partnership" that partnered with historic developers.  The source partnership fund became a 0.01% limited partner in selected historic property development partnerships and provided capital to those partnerships in exchange for Virginia historic rehabilitation tax credits.  The source partnership fund invested only in completed historic rehabilitation projects.  The funds solicited investors who were willing to contribute capital in exchange for the allocation of Virginia historic rehabilitation tax credits.  The funds

[*32] promised that each investor would receive $1 in Virginia historic rehabilitation tax credits for every $0.74 to $0.80 contributed. The funds also promised that each investor would receive a very small partnership interest in the funds, although the funds cautioned that the investors should not expect to receive any material amounts of partnership income or loss. If the promised tax credits could not be obtained, the funds agreed to refund the investor's capital, net of expenses.

The Commissioner determined, among other things, that the transactions between the investors and the funds were disguised sales under section 707. The Court of Appeals agreed with the Commissioner.

As a preliminary matter, the Court of Appeals rejected the funds' argument that no transfer of property had occurred between the funds and their investors. The Court of Appeals also rejected the funds' argument that the credits were not transferred but rather allocated to the investors because the investors were acting in their capacity as partners.

The Court of Appeals then examined whether the funds engaged in a disguised sale under section 707, considering the presumption of sale under section 1.707-3(c), Income Tax Regs., in the light of the factors enumerated in

[*33] section 1.707-3(b)(i)-(iii), (ix), and (x), Income Tax Regs.[6]  Va. Historic Tax

Credit Fund 2001 LP v. Commissioner, 639 F.3d at 143.  The Court of Appeals

concluded its discussion by examining the requirements in section 1.707-3(b)(1),

Income Tax Regs.  The Court of Appeals noted that the "but for" test was

satisfied, finding that the only risk the investors faced was that of an "advance

purchaser who pays for an item with a promise of later delivery."  Va. Historic Tax

Credit Fund 2001 LP v. Commissioner, 639 F.3d at 145.

There are some factual differences between Va. Historic and the case at

hand.  The Virginia tax credits in Va. Historic were nontransferable historic

rehabilitation tax credits provided to Virginia taxpayers who rehabilitated a

historic property, whereas the transferable Virginia tax credits in this case are

provided to Virginia taxpayers who donate land interests for conservation or

preservation purposes.  The Virginia historic rehabilitation tax credits were

allowed for up to 25% of eligible expenses, whereas the Virginia tax credits in this

case are allowed for up to 50% of the fair market value of the donated land or

interest in land.  This distinction may contribute to the difference between the

---

[6]The Court of Appeals did not analyze the other five factors enumerated in sec. 1.707-3(b), Income Tax Regs., on the ground that they were not relevant in the context of Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 144 n.19.

**[\*34]** dollar-to-tax-credit contribution ratios used in the two cases. The investors in <u>Va. Historic</u> contributed $0.74 to $0.80 for every $1 of tax credits they received, while Virginia Conservation contributed $0.53 for every $1 of tax credits it received.

The partnership structures in <u>Va. Historic</u> and the case at hand are also different. <u>Va. Historic</u> involved a complex web of partnerships with hundreds of investors, most of whom received a 0.01% partnership interest in the funds, while Route 231 is a stand-alone partnership with three partners, including Virginia Conservation, which received a 1% interest in Route 231. Unlike the investors in <u>Va. Historic</u>, who were partners in the funds for approximately five or six months, Virginia Conservation is still a partner in Route 231. Moreover, the Commissioner argued in <u>Va. Historic</u> that the investors were not valid partners, whereas respondent does not question whether Virginia Conservation was a valid partner.

In an attempt to distinguish it from the funds in <u>Va. Historic</u>, petitioner stresses that Route 231 was a valid partnership, writing: "Unlike <u>Virginia Historic</u>, this was not a case of 'grab the tax credits and run'." Petitioner's claim is misguided. Respondent does not challenge that Route 231 was a valid partnership.

**[\*35]**   These differences, however, do not detract from the compelling similarities between Va. Historic and the case at hand.  When we consider the controlling facts in this case, we find that Va. Historic is squarely on point with respect to determining whether Route 231 engaged in a disguised sale.  The investors in Va. Historic contributed money to the funds' capital account; in return the funds gave them a small partnership interest and promised to provide them with a fixed amount of Virginia historic rehabilitation tax credits.  In this case Virginia Conservation contributed money to Route 231; in return Route 231 gave Virginia Conservation a 1% partnership interest and promised to provide a fixed ratio of money to Virginia tax credits.  Moreover, the Court of Appeals decided many of the same types of issues implicated in this case:  (1) whether contributions were disguised sales under section 707, taking into account the requirements in section 1.707-3(b)(1) and (2), Income Tax Regs., and the presumption of sale provided by section 1.707-3(c), Income Tax Regs.; (2) whether Virginia tax credits constituted property for purposes of section 707; and (3) whether Virginia tax credits were transferred or "allocated" for purposes of section 707.  Because of these similarities, under the Golsen rule we follow the decision of the Court of Appeals for the Fourth Circuit in Va. Historic.

[*36] C.    Analysis

All relevant actions regarding the transfers between Route 231 and Virginia

Conservation took place well within a two-year period.  Therefore, we presume

that the transfers were a sale.  See sec. 1.707-3(b)(2), Income Tax Regs.

### 1.    Whether There Was a Valid Transfer of Property

Neither party disputes that Virginia Conservation transferred money to

Route 231 for purposes of section 707(a)(2)(B)(i).  Petitioner, however, claims

that Route 231 did not transfer property to Virginia Conservation for purposes of

section 707(a)(2)(B)(ii) because the Virginia tax credits "retained their character

as potential reduction of taxes".

The Court of Appeals for the Fourth Circuit directly addressed this issue in

Va. Historic.  The Court of Appeals explained that the determination of whether

something is property is a hybrid Federal and State law question.  Referring to the

common idiom of property as a "bundle of sticks", the Court of Appeals noted that

State law determines which sticks are in a taxpayer's bundle of sticks, while

Federal tax law determines whether those sticks qualify as "property" for tax law

purposes.  Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at

140 (citing United States v. Craft, 535 U.S. 274, 278-279 (2002)).  The Court of

Appeals determined that the Virginia historic rehabilitation tax credits were

[*37] property for the purposes of being transferable under section 707 because they were "both 'valuable' and imbued with 'some of the most essential property rights'." Id. at 141 (quoting Craft, 535 U.S. at 283). The Court of Appeals noted that the funds used the credits to induce contributions of money and that the funds exercised proprietary control over the credits because they could "exclude others from utilizing the credits and were free to keep or pass along the credits to partners as they saw fit." Id.

Like the funds in Va. Historic, Route 231 used the promise of Virginia tax credits to induce Virginia Conservation to make a contribution of money. Route 231 likewise exercised proprietary control over the Virginia tax credits once it received them. The Virginia tax credits were both valuable and imbued with essential property rights. They are property for purposes of section 707. See also Tempel v. Commissioner, 136 T.C. 341, 354 (2011) (finding that Colorado tax credits created "cognizable property rights in those credits for the recipients of those credits").

Petitioner further claims that the Virginia tax credits were "allocated and not transferred as part of a distribution to Virginia Conservation." The Court of Appeals rejected the same type of claim in Va. Historic, concluding:

**[*38]** [T]his argument is tautological: the test developed in I.R.C. § 707 and Treas. Reg. § 1.707-3 is designed to <u>evaluate</u> whether partners are acting in their partnership capacity when "allocating" property. Thus, the only way we can determine whether the Funds and their investors were acting in their capacity as partners during these transactions is to consider the "facts and circumstances" of the transactions as instructed by I.R.C. § 707 and Treas. Reg. § 1.707-3.

<u>Va. Historic Tax Credit Fund 2001 LP v. Commissioner</u>, 639 F.3d at 140 n.13.

Consequently, we find that Route 231 transferred property to Virginia Conservation for purposes of section 707(a)(2)(B)(ii).

> 2.     <u>Section 1.707-3(b)(1), Income Tax Regs.</u>

To determine whether the transfers between Route 231 and Virginia Conservation are properly characterized as a sale or exchange of property pursuant to section 707(a)(2)(B)(iii), we must determine (i) whether Route 231 would not have transferred $7,200,000 in Virginia tax credits to Virginia Conservation but for the fact that Virginia Conservation transferred $3,816,000 to it; and (ii) if we do not consider the transfers simultaneous, whether Route 231's transfer was not dependent on its entrepreneurial risks. <u>See</u> sec. 1.707-3(b)(1), Income Tax Regs. We note that petitioner's contention that Route 231 is a valid partnership, though undisputed, has no bearing on our analysis of a disguised sale. Likewise, the validity of a partner-partnership relationship does not matter for purposes of section 707. <u>See</u> sec. 1.707-3(a)(3), Income Tax Regs.

**[*39]**            a.      <u>The "But for" Test</u>

The parties expressly linked the amount of Virginia tax credits that Virginia Conservation received to the amount of money it transferred to Route 231. Under the terms of the first amended operating agreement Virginia Conservation promised to make a contribution equal to $0.53 for each $1 of Virginia tax credit allocated, and Route 231 agreed to allocate between $6,700,000 and $7,700,000 of Virginia tax credits to Virginia Conservation. Route 231 further promised Virginia Conservation the lion's share of the Virginia tax credits, allocating $300,000 to petitioner, who held a 49.5% interest in Route 231, and the remaining tax credits to Virginia Conservation, which held only a 1% interest in Route 231.

Route 231 would not have transferred $7,200,000 of Virginia tax credits to Virginia Conservation but for the fact that Virginia Conservation had transferred $3,816,000 to it. We note that Route 231, petitioner, and Mr. Humiston promised to indemnify Virginia Conservation fully for any Virginia tax credits disallowed by the VDT or the IRS. Petitioner also guaranteed implicitly that Virginia Conservation would receive the number of credits it expected to receive: When the final figures showed that Virginia Conservation was short $84,000 of Virginia tax credits, petitioner transferred $84,000 of his Virginia tax credits to make up the difference.

**[\*40]**  We thus find that the "but for" test in section 1.707-3(b)(1)(i), Income Tax Regs., was satisfied.  This finding is consistent with the finding in Va. Historic. As in the case at hand, the funds in Va. Historic promised (1) to provide each investor $1 in Virginia tax credits for every $0.74 to $0.80 contributed and (2) to refund the investor if the credits could not be obtained.  The Court of Appeals found that there was "no dispute" that the "but for" test was satisfied.  Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 145.

### b. Entrepreneurial Risks

Respondent contends that the transfers of cash and credits occurred simultaneously.  Regardless of whether the transfers were simultaneous, we find that the transfer of credits did not depend on any entrepreneurial risks of Route 231's operations.  Entrepreneurial risk is the "risk of the entrepreneur who puts money into a venture with the hope that it might grow in amount but with the knowledge that it may well shrink."  Id. at 145-146 (citing Commissioner v. Tower, 327 U.S. 280, 287 (1946)).

The amount of credits Virginia Conservation received was based entirely on a fixed rate of return ($1 of Virginia tax credit for every $0.53 contributed) rather than on a share of partnership profits tied to Route 231's operations.  Indeed, there is no indication in the record that Virginia Conservation even considered Route

**[*41]** 231's operations before it agreed to contribute a substantial amount of money. Moreover, Virginia Conservation was shielded from losing its contribution because of the indemnity clause and because petitioner provided $84,000 of Virginia tax credits to Virginia Conservation so that it would not receive fewer credits than it had anticipated.

Thus, the transfer of credits did not depend on any entrepreneurial risks. This finding is also consistent with the finding in Va. Historic, in which the Court of Appeals held that the investors did not face any true entrepreneurial risk because (1) there was a fixed rate of return on investment instead of any share in partnership profits tied to the investor's partnership interests and (2) the investors were secured against losing their contributions because the funds promised a refund if the credits could not be delivered or were revoked, among other things. Id. at 145.

### 3. Facts and Circumstances Test

The facts and circumstances test in section 1.707-3(b)(2), Income Tax Regs., confirms that the transfers between Route 231 and Virginia Conservation were a disguised sale under section 707(a)(2)(B).

The first relevant factor is whether the timing and amount of the sale were determinable with reasonable certainty at the time of Virginia Conservation's

[*42] transfer. See sec. 1.707-3(b)(2)(i), Income Tax Regs. Virginia Conservation transferred $3,816,000 to Route 231 via an escrow agent, with the understanding that it would receive $1 of Virginia tax credits for every $0.53 it transferred. Route 231 further promised that Virginia tax credits would be earned on or before December 31, 2005. This factor weighs in favor of a disguised sale. See Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 143.

The second relevant factor is whether Virginia Conservation had a legally enforceable right to receive the Virginia tax credits. See sec. 1.707-3(b)(2)(ii), Income Tax Regs. Under the first amended operating agreement Route 231 promised to provide between $6,700,000 and $7,700,000 of Virginia tax credits. Route 231, petitioner, and Mr. Humiston also promised to refund the amount of any tax credits disallowed by the VDT or the IRS. The second amended operating agreement further states that Route 231 allocated $7,200,000 of Virginia tax credits to Virginia Conservation. Had Route 231 failed to deliver the tax credits, Virginia Conservation could have pursued a breach of contract claim against it. See Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 143. This factor weighs in favor of a disguised sale.

The third relevant factor is whether Virginia Conservation's right to receive the tax credits was secured in any manner. See sec. 1.707-3(b)(2)(iii), Income Tax

**[\*43]** Regs. We note that the Court of Appeals in <u>Va. Historic</u> defined "secured" broadly, holding that the investors' rights were secured because, among other things, the funds promised to refund investor capital if sufficient credits could not be obtained or were revoked. <u>Va. Historic Tax Credit Fund 2001 LP v. Commissioner</u>, 639 F.3d at 143. In the first amended operating agreement Route 231 committed to providing a certain amount of tax credits within a particular range to Virginia Conservation. Route 231 further committed to earning the Virginia tax credits on or before December 31, 2005. Route 231, petitioner, and Mr. Humiston also guaranteed that Virginia Conservation would receive a refund if the tax credits were disallowed. <u>See id.</u> Finally, we note that when it seemed that Virginia Conservation would receive fewer tax credits than anticipated, petitioner gave some of his Virginia tax credits to Virginia Conservation to make up the difference. The guaranty and petitioner's accommodation both show that Virginia Conservation's right to receive the tax credits was secured. This factor weighs in favor of a disguised sale.

The fourth relevant factor is whether any person lent or agreed to lend Route 231 money or other consideration required to enable Route 231 to make the transfer. <u>See</u> sec. 1.707-3(b)(2)(v), Income Tax Regs. On December 31, 2005, Mr. McGuire, who was providing consulting services to Route 231, informed

**[\*44]** petitioner that Virginia Conservation did not receive enough tax credits to satisfy the number of credits. He thanked petitioner for "permitting us" to transfer $84,000 of his credits to Virginia Conservation and promised that petitioner would receive the $84,000 of credits in 2006. Petitioner thus lent the tax credits to Route 231 that it needed to complete the transfer of the promised Virginia tax credits to Virginia Conservation. This factor weighs in favor of a disguised sale.

The fifth relevant factor is whether the amount of Virginia tax credits is disproportionately large in relationship to Virginia Conservation's general and continuing interest in Route 231's profits. See sec. 1.707-3(b)(2)(ix), Income Tax Regs. When it received the Virginia tax credits, Virginia Conservation held a 1% interest in partnership profits and losses and distribution of net cashflow, whereas petitioner and Mr. Humiston each held a 49.5% interest. Yet Virginia Conservation received approximately 97% of the Virginia tax credits. The size of the transfer of credits was tied to the amount of money Virginia Conservation contributed. This factor weighs in favor of a disguised sale. See Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 144.

The final relevant factor is whether Virginia Conservation has any obligation to return or repay the Virginia tax credits to Route 231. See sec. 1.707-3(b)(2)(x), Income Tax Regs. After receiving the tax credits, Virginia

[*45] Conservation could use them for its own benefit; it had no further obligations to Route 231. This factor weighs in favor of a disguised sale. See Va. Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d at 144.

In sum, the facts and circumstances test confirms that Virginia Conservation and Route 231 engaged in a disguised sale under section 707(a).

IV. Disguised Sale as Income for 2005

Because we concluded that the transaction between Route 231 and Virginia Conservation regarding the Virginia tax credits is a disguised sale under section 707, we must decide whether the income from the sale was reportable for tax year 2005 or tax year 2006. Respondent contends that because the sale occurred in 2005 and the payment was received in 2005, the proceeds of the disguised sale were reportable as income for 2005. Petitioner contends that because Route 231 did not receive payment until 2006, the proceeds would have been reportable as income for 2006.

A. Earning Virginia Tax Credits

Petitioner claims that Route 231 could not have sold the Virginia tax credits in 2005 because it did not register the credits with the VDT until 2006. We disagree.

[*46]   In 2005 a taxpayer was not required to apply to the VDT in order to receive a Virginia tax credit. See Va. Code Ann. sec. 58.1-512 (West 2005).  In 2005 Va. Code Ann. sec. 58.1-512 (Va. sec. 58.1-512) provided that a taxpayer could receive a Virginia tax credit for land preservation if (1) the taxpayer made a qualified donation of land or an interest in land; (2) a qualified appraisal prepared by a qualified appraiser substantiated the fair market value of the donation; (3) the qualified appraisal was signed by the qualified appraiser, who had to be licensed in Virginia, and a copy of the appraisal was submitted to the VDT; (4) the qualified donation was made to the Commonwealth of Virginia, an instrumentality thereof, or a qualified charitable organization; and (5) the preservation or similar use and purpose of such property was assured in perpetuity.  Thus, a taxpayer earned and held a Virginia tax credit when he or she satisfied the statutory requirements for the credits.  The VDT merely acknowledged and registered the credits to create an accounting track record.

In 2006, however, Virginia changed the statutory requirements applicable to the Virginia tax credits for conveyances made on or after January 1, 2007.  Among other things, Virginia expressly required a taxpayer to "apply for a credit after completing the donation by submitting a form or forms prescribed by the Department [the VDT]" before he or she would be issued Virginia tax credits for

[*47] donations made on or after January 1, 2007. Va. Code Ann. sec. 58.1-512(D)(1) (West 2007). Thus, the VDT began to actively issue the credits only with respect to conveyances made in 2007.

There is no dispute that Route 231 met the requirements of Va. sec. 58.1-512 as prescribed in 2005. On December 30, 2005, the instruments conveying the easements and fee simple interest were recorded with the Clerk's Office of the Circuit Court for Albemarle County. The credit acknowledgment letters from the VDT, dated March 27, 2006, listed the effective year for the credits as 2005.

At trial, Cathy Early, an employee of the VDT and lead analyst of the tax credit program, testified that although the VDT received Route 231's Forms LPC and copies of the qualified appraisals on January 27, 2006, the effective date for Route 231's Virginia tax credits was tax year 2005. She explained that the effective date of a tax credit "was driven * * * by the date that the donation was recorded, and * * * [in this case] the donation was recorded December 30, 2005". Ms. Early further testified that even if a Form LPC was received after a Virginia tax return was filed, the taxpayer could still be entitled to a Virginia tax credit on that Virginia tax return.

Furthermore, Va. Code Ann. sec. 58.1-513(C) (West 2005) restricted taxpayers from transferring Virginia tax credits unless the taxpayer was holding

**[\*48]** the credits at the time of transfer. We note that the Virginia tax commissioner likewise has ruled that "any credit transferred during a taxable year may be claimed as a credit on the tax return of the transferee in the taxable year that the transfer of the credit occurs." Rulings of the Va. Tax Comm'r, Pub. Document 03-13 (Mar. 4, 2003).

Because Route 231 possessed the Virginia tax credits in 2005, Route 231 was able to transfer the credits to Virginia Conservation and petitioner on December 30, 2005. Petitioner reported $215,983 in Virginia tax credits on his 2005 Virginia Income Tax Return. Virginia Conservation allocated its Virginia tax credits to Chesterfield Conservancy in 2005. At trial, Daniel Gecker, who owned an interest in Virginia Conservation, testified that Chesterfield Conservancy sold those Virginia tax credits arising to individual investors to be claimed on 2005 returns. None of these transfers could have occurred if Route 231 had not acquired and possessed the Virginia tax credits in 2005.

B.    Date of the Disguised Sale

A disguised sale is considered to take place on the date that, under general principles of Federal tax law, the partnership is considered the owner of the property. Sec. 1.707-3(a)(2), Income Tax Regs.; see also United States v. Irvine, 511 U.S. 224, 238-239 (1994). If the transfer of money or other consideration

**[\*49]** from the partnership to the partner occurs after the transfer of property to the partnership, the partner and partnership are treated as if, on the date of the sale, the partnership transferred to the partner an obligation to transfer to the partner money or other consideration. Sec. 1.707-3(a)(2), Income Tax Regs. A similar rule applies when the transfer of property from the partnership to the partner occurs after the transfer of money to the partnership. See sec. 1.707-6(a), Income Tax Regs.

Section 61(a) provides generally that gross income means all income from whatever source derived. Section 61(a)(3) provides that gross income includes gains derived from dealing in property. See also sec. 1.61-6, Income Tax Regs. Section 1001(a) provides that the gains from the sale or other disposition of property shall be the excess of the amount realized over the adjusted basis. Unless otherwise provided, the entire amount of the gain or loss on the sale of the property is recognized. Sec. 1001(c).

State law determines and governs the nature of property rights, while Federal law determines the appropriate Federal tax treatment of those rights. See Keith v. Commissioner, 115 T.C. 605, 611 (2000). "The term 'sale' is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay." Grodt & McKay Realty, Inc.

**[*50]** v. Commissioner, 77 T.C. 1221, 1237 (1981) (citing Commissioner v. Brown, 380 U.S. 563, 570-571 (1965)). A sale occurs for Federal income tax purposes when there has been a transfer of the benefits and burdens of ownership; this is a question of fact that must be ascertained from the intention of the parties as evidenced by a written agreement read in the light of the attending facts and circumstances. Id.

The Court has considered the following factors in determining whether a transfer of the benefits and burdens of ownership has occurred: (1) whether legal title passed; (2) how the parties treated the transaction; (3) whether an equity interest in the property was acquired; (4) whether the contract created a present obligation on the seller to execute and deliver a deed and present obligation on the purchaser to make payments; (5) whether the right of possession was vested in the purchasers; (6) which party paid the property tax; (7) which party bore the risk of loss or damage to the property; and (8) which party received the profits from the operation and sale the property. Calloway v. Commissioner, 135 T.C. 26, 33-34 (2010), aff'd, 691 F.3d 1315 (11th Cir. 2012). In the case of certain intangible assets we have focused on whether there was a transfer of substantial rights of value. Bailey v. Commissioner, 90 T.C. 558, 607 (1988), aff'd in part, vacated in part, 912 F.2d 44 (2d Cir. 1990).

**[\*51]**  The first relevant factor is whether legal title passed in 2005.  As discussed above, Virginia law in 2005 required a taxpayer to hold a tax credit before transferring it.  The record reflects that Virginia Conservation transferred the Virginia tax credits it received from Route 231 to Chesterfield Conservancy in 2005, and Chesterfield Conservancy transferred the credits to other individuals and entities in 2005.  Legal title passed from Route 231 to Virginia Conservation in 2005.

The second relevant factor is how the parties treated the transaction.  The record reflects that the parties intended for the transaction to occur in 2005, and that they treated the transaction as having occurred in 2005.  The escrow agreements, executed on December 28, 2005, stated that Mr. Skeen should immediately return the escrow proceeds, without deduction, to Virginia Conservation if either (i) the deeds of gift were not recorded in the said Clerk's Office on or before December 31, 2005, or (ii) Virginia Conservation was not admitted as a 1% partner in Route 231 on or before December 31, 2005.  The first amended operating agreement stated specifically that the credits were for calendar year 2005.  On its Schedule K-1 for Virginia Conservation, Route 231 reported that Virginia Conservation contributed capital of $3,816,000 in the 2005 tax year.

**[*52]** Moreover, Chesterfield Conservancy and the individuals to which it ultimately sold the credits acted as though the transfer occurred in 2005.

The third relevant factor is whether an equity interest in the property was acquired. Virginia Conservation held an equity interest in the Virginia tax credits in 2005 because it could pass or keep the credits as it saw fit starting in 2005 (as evidenced by the fact that it passed the credits to Chesterfield Conservancy in 2005) and because it could exclude Route 231 from otherwise using the tax credits.

The fourth relevant factor is whether the seller had a present obligation to execute and deliver a deed and the purchaser had a present obligation to make payments. The transaction between Route 231 and Virginia Conservation was structured as a partnership allocation, and Virginia Conservation was to receive the Virginia tax credits in 2005. The terms of the escrow provided that if the deeds of gift were not recorded on or before December 31, 2005, or if Virginia Conservation was not made a partner in 2005, the total payment was to be returned to Virginia Conservation. If Route 231 performed its part of the agreement, then it would keep the amount Virginia Conservation paid and the interest earned on the payment. Under the first amended operating agreement, Virginia Conservation agreed to pay $0.53 for each $1 of Virginia tax credits it received, and it

[*53] anticipated to receive between $6,700,000 and $7,700,000 of Virginia tax credits. Route 231 had a present obligation to execute and deliver the deeds, and Virginia Conservation had a present obligation to make a payment.

The fifth relevant factor is whether the right of possession was vested in the purchasers. As discussed above, for any donation of land made before January 1, 2007, Virginia tax credits existed under Virginia law before they were acknowledged and registered by the VDT. Moreover, Virginia Conservation represented on its Forms LPC that the right of possession in the tax credits was vested in it in 2005 and that it transferred the credits to Chesterfield Conservancy. The right of possession was vested in Virginia Conservation in 2005.

The sixth relevant factor is which party bore the risk of loss or damage to the property. The property in the instant case is intangible property. Therefore, we consider who bore the loss if there had been a decrease in economic value. See Calloway v. Commissioner, 135 T.C. at 36 (finding that the taxpayer bore no risk of loss in the event that the value of the stock at issue decreased). Once Virginia Conservation received the Virginia tax credits, it transferred them to Chesterfield Conservancy. As discussed above, Virginia Conservation represented that this transfer occurred in 2005. If Virginia Conservation had not transferred the Virginia tax credits immediately, it would have borne the risk that the value should

[*54] decline.  Likewise, Virginia Conservation would have benefited from a profit if the value of the credits increased.  Route 231 and the other partners, however, were obligated to refund Virginia Conservation's payment in the event that the VDT or the IRS disallowed the Virginia tax credits.  In that sense, Route 231 and the other partners bore the risk of loss.  This factor is neutral.

In the light of the above, we conclude that Route 231 sold the Virginia tax credits to Virginia Conservation in 2005.

C.     Income From the Disguised Sale Reportable for 2005

In the alternative, even if Route 231 had not completed the disguised sale in 2005, Route 231 nonetheless would have been required to report the income from the sale for tax year 2005 because it is an accrual method taxpayer.

Generally, a taxpayer is required to include gains, profits, and income in gross income for the taxable year in which he or she actually or constructively received them, unless they are otherwise includible for a different year in accordance with the taxpayer's method of accounting.  Sec. 451(a); sec. 1.451-1(a), Income Tax Regs.  A taxpayer like Route 231 that uses the accrual method of accounting includes an item of gain, profit, or income in its gross income for the taxable year in which (1) all events have occurred that fix its right to receive

**[\*55]** income and (2) the amount can be determined with reasonable accuracy. Secs. 1.451-1(a), 1.446-1(c)(1)(ii), Income Tax Regs.

The parties do not dispute that the amount of Virginia Conservation's payment could be determined with reasonable accuracy. Petitioner contends that the "all events" test was not met until 2006.

### 1. The "All Events" Test

All events have occurred that fix the taxpayer's right to receive income when (1) the required performance takes place, (2) the payment is due, or (3) the payment is made, whichever comes first. Johnson v. Commissioner, 108 T.C. 448, 459 (1997), aff'd in part, rev'd in part on other grounds,184 F.3d 786 (8th Cir. 1999).

Petitioner contends that Route 231 "did not actually receive the $3,816,000 capital contribution from Virginia Conservation in 2005" because there was a bona fide escrow and conditions of this escrow were not satisfied until March 30, 2006.

The escrow agreements were executed on December 28, 2005. Virginia Conservation made two wire transfers totaling $3,816,000 to Mr. Skeen's non-interest-bearing attorney trust account on December 29, 2005. The amount of the

 **[*56]** transfers represented $0.53 for every $1 of Virginia tax credits that would be allocated to Virginia Conservation.

The escrow agreements state specifically that Mr. Skeen would immediately return the escrow proceeds to Virginia Conservation if (i) the deeds of gift were not recorded in the Clerk's Office on or before December 31, 2005, or (ii) Virginia Conservation was not made a 1% partner in Route 231 on or before December 31, 2005. The actions described above occurred on or before December 31, 2005. Route 231 knew at the close of 2005 that the escrow funds would not be returned to Virginia Conservation. Therefore, all events necessary to fix Route 231's right to receive income from Virginia Conservation occurred in 2005.[7]

Consequently, we find that Route 231 would have been required to report the payment from Virginia Conservation for tax year 2005 as an accrual method taxpayer regardless of whether the sale actually took place in 2005.

---

[7]The escrow agreements also stated that Route 231 would provide to Virginia Conservation the credit transaction number, the evidence of recordation of the deed of gift, the new owner's policy, and disbursement authorization from Virginia Conservation's counsel. These acts were ministerial and not conditions precedent, and we need not determine whether Route 231 properly performed them.

[*57] 2.    Route 231's Admission

We further note that Route 231 admitted that the contribution from Virginia Conservation occurred in 2005 under the accrual method of accounting. Route 231 reported on its 2005 Form 1065 that it received $3,816,000 from Virginia Conservation. It also reported on the Schedule K-1 for Virginia Conservation for its 2005 Form 1065 that Virginia Conservation contributed capital in the total amount of $3,816,000. Petitioner likewise states in his petition: "In 2005, Virginia Conservation contributed $3,816,000 in cash to Route 231".

We have held repeatedly that statements made in a tax return signed by a taxpayer are binding and treated as admissions. Mendes v. Commissioner, 121 T.C. 308, 312 (2003) (citing Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), aff'g T.C. Memo. 1968-126, Lare v. Commissioner, 62 T.C. 739, 750 (1974), aff'd without published opinion, 521 F.2d 1399 (3d Cir. 1975), and Kaltrieder v. Commissioner, 28 T.C. 121, 125-126 (1957), aff'd, 255 F.2d 833 (3d Cir. 1958)). A taxpayer "cannot  * * * disavow * * * [his or her tax] returns without cogent proof that they are incorrect." Crigler v. Commissioner, T.C. Memo. 2003-93, slip op. at 13, aff'd per curiam, 85 Fed. Appx. 328 (4th Cir. 2004).

**[\*58]**  Petitioner has not shown why the statements on Route 231's 2005 Federal income tax returns are incorrect.  Therefore, Route 231 admitted that the disguised sale, which it characterized erroneously as a capital contribution, occurred in 2005 for purposes of the accrual method of accounting.

V.    Conclusion

We hold that the transactions in issue between Route 231 and Virginia Conservation amounted to a disguised sale under section 707(a) and that the disguised sale took place in 2005.  Any contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

Decision will be entered

under Rule 155.